Good afternoon, Illinois Appellate Court First District Court is now in session, the Sixth Division, the Honorable Justice Mary L. McPherson presiding case number 21-0402 consolidated with 210584 N. Ray Daniel Holt. Good afternoon, gentlemen. Welcome to oral argument. Would you before we start each of you please state your names for the record beginning with Mr Barnes and tell us who you represent. Sure, your honor Ian Barnes on behalf of respondent appellant Daniel Holt. Good morning, your honor. I'm Assistant Attorney General Jason Kregel for the people. Okay. As you probably both know we generally a lot 20 minutes per side, Mr. Burns, do you want to reserve any of that for rebuttal. Yes, your honor. Thank you. I think I would like four minutes, please. Okay, good. Whenever you're ready, you may proceed. Thank you, your honor. May it please the court, and my colleague from the state. The SVP X risk element asks whether a respondent is dangerous, because a mental disorder makes it substantially probable that he will engage in acts of sexual violence, but the outcome of this case was predicated on risk assessments that considered unknown and undisclosed future variables. The state presented to experts who applied their own novel interpretation of the statute and opined that Mr Holt is dangerous when accounting for his risk at an indefinite point in the future. It was error to admit and consider these opinions, and for that reason this case should be reversed for a new trial. In turn, I'd like to address that issue as well as the conditions of Mr Holt's release that violate this First Amendment and due process rights. As to the remaining issues I would stand on the briefing, unless your honors have any questions on those topics. I'd like to start with the fundamental premise that experts are not competent to perform statutory interpretation, they may not say what the law is, they may not develop their own standards. And yet that is precisely what Drs. Travis and Kousia did in this case, when they testified that the X risk element is not time limited. The Act says nothing on that topic, it is silent as to whether the risk element is time limited. And it's clear that Dr. Travis and Dr. Kousia were imposing their own reading of the statute, their own interpretation of what the legislature meant when they did their risk assessments in this case. And not only was it improper for them to do statutory interpretation, but their interpretation is simply incorrect, and it resulted in significant prejudice to Mr. Holt. The Act is framed in present tense, it says, it asks whether the respondent is dangerous, and we have cases like Rendon and Gavin and Cooper, all of which support the idea that what the Act is really after is an assessment of current risk. And to understand the prejudice in this case, I think we have to look at Dr. Travis's testimony when he says that a risk estimate is an underestimate unless it extends until the time of death. Because that necessarily means that when he's taking all of the known quantities, things that we deal with in these cases all the time, the actuarial instruments that are based on historical factors, or the empirical risk factors that are based on past behavior. Excuse me, or the details of Mr. Holt's offenses. He's saying that these things all lead to an underestimate, which forces us to conclude that he's considering other things in the future. And the problem with this, of course, is that it's impossible to defend against. We can cross examine on the static 99 and the use of it and the risk estimates that go with it, we can cross examine on the use of dynamic risk factors, and the meta analyses that they're contained in. We can cross examine on the details of his offenses. We can't cross examine on things that are unknown and unknowable, because they haven't happened yet. I think Dr. Travis's testimony really highlights the absurdity of this, when he says the risk estimate has to extend until Mr. Holt's time of death, when we don't know when that will be. We have no clue what will transpire between now and when Mr. Holt dies. We don't know whether that will be 10 years from now, or 15 years from now, or 25 years from now. And if the legislature had intended for experts to engage in this sort of indefinite prospective analysis, they would have worded the statute such. And on top of that, we would not need the annual re-exam process. If experts were able to look forward into the future with their crystal ball, we would not need an annual re-exam process every year that's supposed to account for new things that have happened, new progress and treatment, new studies, new behavior. So all of this is to say that they took a process that is already imprecise and indefinite. We're already trying to estimate the probability of something happening, and they injected an extra layer of uncertainty into it. Let me stop you for a second, because I certainly agree with you that it's imprecise and asking people to opine on a very difficult thing to opine on. But as the Supreme Court noted in Samuelson, when you talk about dangerousness, you're talking about a probability that someone is going to engage in acts of sexual violence in the future. That's what dangerous means. Presently, you're dangerous because there's a prediction that in the future, you're going to do something violent and sexually violent. What else could dangerous mean? I mean, if it is by definition, is it not something that's going to happen in the future? Of course, Your Honor, and I agree with you 100%. I think the difference here is that ordinarily we're talking about predicting what might happen or estimating the probability of what might happen, I should say, based on known quantities, based on things that already exist now. We have the actuarial instruments and the samples, and those are all based on historical factors or dynamic risk factors that are based on Mr. Holt's behavior up until this point. The difference is when Dr. Travis and Dr. Kuzia say the risk assessment isn't time-limited, they seem to be trying to predict the future, not just estimate probability. And that's the harm, that's the difference, that's what makes it so hard to probe what it is they're relying on when they're deciding what the statute means. So for those reasons, I would ask this court to reverse and remand for a new trial. But in the alternative, I'd like to go into the conditions of Mr. Holt's release. And at the outset, there's a couple points that I think need to be made globally. The first one being that by virtue of being on conditional release, someone has deemed Mr. Holt to be less than substantially probable while he's subject to these conditions. And the other point is, if we look at the record from the trial court, none of these conditions contained any sort of showing as to why they are specific to Mr. Holt, why these conditions need to apply to Mr. Holt based on his offenses, the details of them, his behavior, his treatment. They are simply imposed as a de facto blanket set of restrictions. Excuse me. And in that context, I'd like to start with conditions 33, 24, and 61, which respectively ban him completely from the internet, ban him from publishing anything on any topic, and ban him from speaking to journalists or reporters on any topic in any media. Can you focus if you will? To me, those are not all equivalent. 33, I think, is far more global than the other two. Granted, the other two certainly have First Amendment unification, but I am perplexed as to how one can live in 2022 with no access to the internet. Well, I'm glad you said that, Your Honor, because I think you read my mind. Today, we live in a society where the internet really permeates everything we do. It has not only enhanced our ability to live, but it's really replaced a lot of the ways that we do things. We order food online. We get our news online. We do these arguments online now. And I understand your client is participating online through some, I guess, exception to 33 or some. Right. And I think the reasoning that we get in Packingham and Morger is really instructive here, because in those cases, they struck down restrictions only on social media, not the internet as a whole, but only social media and said those are impermissible. And part of the reasoning was that for someone who is seeking to reenter society and live a rewarding and lawful life, access to the world of ideas is critical. And for Mr. Holt, that's exactly the position that he finds himself in now. He's on conditional release. That is a transitionary period between confinement to a secure facility and full discharge. This is the time when he's supposed to be able to prove that he can reenter society, that he can abide by the rules, that he can readjust to society that he hasn't been in since the 90s, when the internet was clearly very different in the 90s. And also, how would you suggest that we monitor his use of the internet? What are the options? There's a couple ways. The plan already sets out that if he's, as of now, when he's prohibited from having any electronic devices, he is required to submit to a forensic search if he's found to have any devices. So Liberty Healthcare already has the means to go in, look at an electronic device and see what he's doing with it. But on top of that, every employer today has the ability to monitor an employee's browsing history or what they're doing on a computer. Surely Liberty Healthcare has the same means to do that on a regular, ordinary basis to make sure that he's not using the internet for illicit purposes. And it's worth noting that none of his offenses in the past have ever used the internet. And that brings me back to the point of, this isn't particularized to him. It's not imposed because he has done something in the past related to the internet. It's simply a blanket punitive restriction that is really inhibiting his ability to rehabilitate himself. Well, as you stated, counsel, the internet was a different animal at the time that he was convicted. So, you know, while I understand your position, let me just clarify that. So you have no objection to having these other restrictions on internet use? Well, I think my position, Your Honor, is that if there is a restriction, it should be narrowly tailored to prohibit unprotected activity. Activity that would not fall within the First Amendment. But as it exists now, it is simply a global ban on the entirety of all human knowledge that now exists on the internet, which surely cannot be related to Mr. Holt and his offenses. Just like the other two, the prior restraints on speech, really have nothing to do with him as a person, his offenses. You know, there's been no showing why Mr. Holt can't speak to a reporter about a fire on his block, right? These are the things that are prohibited that are really more punitive. They muzzle him, they silence him. They don't allow him to participate in society for reasons which I'm sure the state will say it's meant to limit his access to victims. But the plan is filled with conditions that already do that in far less restrictive ways. He can't talk to... Yes, and the problem with that, Your Honor, is that we have given the discretion on who he may speak to, what he may publish, to an employee of a private company, not the courts. And all of our prior restraint jurisprudence says this is supposed to be left to the courts. They're supposed to be narrow, they're supposed to be for a limited time, and they're supposed to be an opportunity for judicial intervention. Well, that leads to my next question, which is, the court, as I understand, and you know this far better than I do, the court retains jurisdiction over these cases. Is that correct? Yes. Between these annual reviews. Right. So if, for example, the agency were to deny him something, would there be, is there a mechanism to get review of that, or of restrictions as they are imposed or as they are interpreted? I suppose. I don't know that it's ever come up. But I think the more glaring issue with that is that the default position shouldn't be a stranglehold on basic First Amendment activity, and that Mr. Holt should have to petition the court to regain some of it. I think the default position should be, he has his First Amendment rights, and the state should bear the burden of showing why he should be censored. That being said, unless your honors have other questions on these, I do want to touch briefly on conditions 28 and 66. And I want to give you an opportunity to do that, so go ahead and do that, and then I do have one question. Sure. Which together run afoul of due process vagueness principles. Together, those two conditions have the effect of giving liberty health care, the ability to impose new conditions on virtually any topic on any scope, without notice to the parties, without notice to the courts, and condition 66 makes it Mr. Holt's burden to clarify problems with the plan. And as we enumerated in the briefing there are a few examples of conditions that list places he may not go items he may not possess, and they're always non exhaustive lists and condition 66 puts the burden on Mr. Holt to figure out what other items might be on that list, what other places he may not be able to go. And that's the exact opposite of what due process vagueness principles require, they require that he be able to look at that plan and figure out what is prescribed and what is not. And as they exist currently liberty health care has essentially given itself an out, if they forget something. If they've forgotten an item. They can come back after Mr Holt engages in that activity that wasn't specifically prescribed and say you should have asked us. And now his liberties and jeopardy because of that. So they essentially function as a welcome mat for arbitrary enforcement. And that's simply not what due process requires. So, for all of those reasons, this court should remand for modification of the plan. I don't have anything further unless your honors have one question I'm going to ask the Attorney General as well. Why we seem to take so long. This petition was filed in 2016. We're now 2022. I assume. And that's just a very long time. You have any explanation or assurance to give us that nothing terrible is happening in that delay. The. In terms of pre trial. I unfortunately think that's straining my memory a little bit your honor. In terms of what happened between the time of his trial, and the dispositional hearing. I know that can be partially chalked up to coven, but also the state had asked for a second opinion, because Dr. Travis who testified at trial that Mr Holt should be committed did ultimately opine that he could be released on to conditional release and the state sought the opinion of Dr. Keaton as a second opinion. So I know that's what transpired between commitment and disposition as to pre trial, I would be really guessing as to what pre trial litigation occurred in those in those intervening years. So, I mean, now, he's now being held on conditional release by pursuing two opinions that were rendered initially in 2016 so there's been a pretty significant gap I realized that there were new opinions, given prior to disposition but. And then I didn't mind. Is it correct that I'll have an annual review at some point. Yes, he should get one every year. Starting from women, starting from the date of the disposition hearing I believe and the exact date of that is. But I think there's been at least one. Okay, I can double check. Well, while we move forward, and then those could be a field as well. Right. All right. Thank you. I'm glad you raised that issue of timeliness because counsel you, you know, reference the, the court should be making these decisions as opposed to a third party or other agency. But, you know, frankly, the court is unable to make those determinations on, you know, a expedited more expedited basis on a as needed basis. And so we do need, you know, those agencies that are there, able to make those decisions, you know, on a day to day basis as needed until you're able to exercise your due process in the courts. When you agree. Well, I guess the short answer is no, Your Honor, and I think that all comes back to at least if we're talking about the the First Amendment issues. I think this is going to come back to what the Supreme Court has said about prior restraints and about infringing speech like this, where the burden is not on Mr Holt to justify why he should be able to engage in the speech. If the state is going to try to take away huge broad swaths of activity. It should be on them to do it. And whether the plan, I suppose, one of the fundamental problems with the plan is that it does not contain a mechanism to permit that. So, Mr Holt is unfortunately stuck with these conditions, barring if he petitions the court and the court actually determines that it has jurisdiction to hear it, or what the mechanism is, I mean, I, I suppose at this point. No one has no court has considered these conditions like this, up to this point. So we're sort of treading new ground. I apologize, maybe not a satisfactory answer but fine. Thank you. Thank you. And just so you know you have your full four minutes that was us to take you over. Okay, thank you. Mr. Good morning. Excuse me. Good morning, Your Honor's counsel, and may it please the court. I'm Assistant Attorney General Jason Grego for the people. And I'll, I'll confine my remarks to responding to, to Mr Barnes's arguments, and of course I'm happy to answer questions on the other issues as well. Let me make a couple of points first about the evidentiary issue and then, and then talk about conditional release. So, the first issue that counsel talked about he's framed as challenged to the admissibility of the expert testimony that the experts improperly interpreted the act. But I think it's important to look at the testimony and the testimony that's being complained about here is simply respondents counsel asking the experts to explain their opinions and the experts explaining that their risk analysis took into account. All of the future risk posed by this respondent, and that's perfectly that's not an interpretation of the actors, it's perfectly consistent with the plain meaning of the act that requires that requires the court to determine whether respondents mental conditions make it substantially probable that he will, will engage in acts of sexual violence and as I think Justice Mikva pointed out, there really is no other possible interpretation of that language, other than the experts have to determine whether he will engage in the future. In, in these acts of violence, because at the time that a time respondent is being evaluated of course he is, he's either incarcerated or he's in the detention facility so there really isn't any probability that he's going to commit acts of violence at the precise moment that he's being evaluated the question is whether if he's released. Well, is there a probability that he'll engage in acts of violence and as, as Dr. Travis explained, the actuarial instruments that the experts rely on are necessarily limited to certain time periods, and also look at whether, whether sex offenders are convicted of specific acts so, for example, in this case we know that respondent had almost two dozen victims, many of which he was not convicted of so you have to take into account the possibility of, you know, not only as taking place more than five years in the future but also the possibility that, you know, these acts could be not, not detected so that's why the respondents look or excuse me why the experts look not only at the actuarial instruments but also at the other, at the other factors that have been shown through through studies to increase risk here and respondent had opportunity to cross examine the experts about their application of the actuarial tools and these other factors, and so there was nothing improper about the expert testimony on that point. And then if the court doesn't have other questions about that I'll turn to the conditional release issue. And I want to step back for a minute on this, and sort of try and put it into context because it's important, both for our merits of the individual challenges to these conditions and also our argument that respondent has waived these challenges here, because the context here is that conditional release under the SVP Act is not like probation, and it's not like general sex offender restrictions that apply to every sex offender. This is not just about, as, as counsel argues, just not just about transitioning respondent back into the community. In this case, there's been a specific fact finding that this respondent continues to be mentally ill and is likely to commit acts of sexual violence in the future. And the act provides that he remains in the custody of DHS, even while he's on conditional release, and he's going to continue to receive treatment and, and to be regularly evaluated. And at some point, it may be determined that he's no longer an SVP and at that point, there would not be the conditional release restrictions, but at this point he remains in the custody of DHS and now section 40 charges DHS with putting together. Once the court determines that conditional releases is appropriate, DHS is charged with putting together the plan to, to account for all of the various treatment needs, and also the safety of the community, while respondent is on conditional release. And again, the SVP Act contemplates this close monitoring and continual treatment. So, in this case respondent has waived his objections to the conditional release plan, because he agreed to the plan and then acquiesced to the court's entry of the plan. Counsel, Counsel, he's entitled to an attorney under the Act, correct? Absolutely, Your Honor. And one will be appointed for him if he can't afford one, just like in criminal cases or child protection cases, correct? Absolutely. And his attorney was not there when he initialed that form that DHS presented to him, correct? That's right, Your Honor, and we certainly do not argue that. There was no opportunity to object to any of these conditions until the court hearing that the attorney made for the court, correct? Yes, Your Honor, and our argument is not that, that counsel is helpless to seek changes on the conditional release plan, but it's a very specific situation of what happened in this case, where the, where respondent made these objections for the first time without alerting the state to give the state an opportunity to respond. And then, instead of standing on the objections, asked the court to enter the plan. And so, if I may just explain our position here, because I understand, I absolutely understand the court's questions. There are a couple of things that respondent could do here. First of all, respondent could have requested additional time. The Act provides that either party can request more time to develop the plan. The Act says that once the court finds conditional release appropriate, the DHS has 60 days to develop this plan. And then… It's fine for you to go through this, but tell me where the lawyer is involved. Is the lawyer present? Yes, so the lawyer represents the respondent throughout this period. It's represented by the same lawyer. And, of course, counsel and his firm have represented many respondents in this position. And, you know, you didn't have to wait 60 days to discuss some of these conditions. Many of these conditions are conditions that apply in every single case. So, if counsel wanted to attempt to negotiate some of these conditions, could have done immediately when the court first said that conditional release was appropriate. How would they be negotiating? No plan had been presented. At what point would counsel see the plan and have a chance to object on behalf of his client? Unless there's an opportunity for that, I don't know how you can talk about waiver. I don't want to take all your time, but honestly, unless there's an opportunity for the attorney to be involved, I don't think that we can say that there's been any kind of waiver. I understand your concerns, Your Honor. And I'll just wrap this up quickly to say that counsel absolutely can object, absolutely can try and bring these constitutional issues to the court's attention. What the respondent can't do is agree to have the plan entered and go on conditional release before DHS has an opportunity to amend the plan to meet any constitutional objections. Because the problem here is that now I'll get into the various conditions. But the problem is here that respondent is saying, well, we don't necessarily disagree that there could be some restrictions on his internet use. Or we don't necessarily disagree that he shouldn't be allowed to have pets. But we think that these conditions go too far. And so now he's placing the burden on the court to essentially rewrite the conditional release plan rather than saying, let's go back to DHS and have the experts craft the plan that's going to meet all of respondents' needs while he's on conditional release. And so I'll go through the conditions that the counsel discussed earlier, starting with the First Amendment issues. These are all reasonable limitations because we know that this respondent has been found to be much more likely than not that he will commit future acts of violence. And the limitations on the use of internet are reasonable here because the internet, you have instant access to all sorts of materials. It's true, obviously, that the internet can be used for innocent purposes. But the problem is that he has instant access with the internet to not just victims, but other materials on the internet that could interfere with his continued treatment. And again, the alternative is not just... The question is, can you protect people from this dangerousness? In fact, I would say walking outside is more dangerous than being on the internet because you can't touch anybody on the internet. You can't hurt them. You may be able to reach out to them, but long before that happens, you could monitor them. I don't understand where there's this immediate dangerousness of internet access that isn't immediate out in the world. If you're going to incarcerate him, which the decision is made not to completely restrict his liberty, you know, why is it more dangerous? And I agree with your honor that there are certainly other dangers out there besides just the internet. And that's why there are quite a lot of restrictions in the conditional release plan. And again, DHS has developed this conditional release plan to try and meet all of respondents' needs in the community and prevent someone, again, who's been found substantially probable to commit acts of sexual violence. And I would also just add that the ban on using the internet is not necessarily the final word here either. Because again, respondent is in constant communication with his treatment team and his conditional release agent while in the community. And he can request accommodations. He can work with the treatment team to meet his needs. And if, you know, and in the event that the treatment team is being unreasonable or not, you know, refusing his requests, he can go to court. And I understand it's not in the record, but I understand that this respondent has done something like this in the past where he's asked to have access to, I think it was another offender. And so asked for an accommodation on that and then brought the issue before the court. So there's always the possibility of going back before the court to have these conditions revisited. And that actually answers another question that I did ask the opposing counsel. On the places where the agency can ask, can add a restraint or something, any of that can go back before the court, correct? And the court has continuing jurisdiction over all conditions. Is that your understanding? Absolutely, Your Honor. And, of course, that's, you know, this is also part of why the, both the SVP Act and this conditional release plan requires respondent to comply with conditions that his team might present. And then to ask for clarification when he's unsure about what exactly he's supposed to be doing. That doesn't make the conditions vague. Now, respondent says, well, it's possible that in some point in the future, the DHS is going to impose some unreasonable condition or surprise respondent in some way. And I guess my response to that is that that's just not an issue that's right, that's before the court right now. I suppose it's always possible that government could do something arbitrary or unfair in the future, but that's just speculation at this point. Right now, all those conditions 28 and 66 require is that respondent follow the rules set by the conditional release team and then ask for clarification when he's unsure about what the rules say. And again, vagueness is not the same as ambiguity as the Supreme Court, the Illinois Supreme Court and this court have explained. Vagueness is when a reasonable person couldn't possibly understand what's being required of him. And here it's quite clear, respondent just has to follow the rules and ask for clarification. So I have a question that's a little unfair because it's beyond the record, but do you have a sense, an estimate of how many people are on conditional release? I don't know the answer to that, Your Honor. My sense is it's not a large number, but I don't handle these issues at trial, so I apologize. I don't know the answer. The reason why I ask is there are 60 some conditions here imposed on Mr. Holt, and I was trying to get a sense of conditions pretty standard for everyone that's similarly situated on conditional release, or is this plan, is it somehow tailored to him? My understanding is that these are pretty much standard for conditional release. Again, many of them are required by Section 40 of the Act. Others are ones that DHS has determined over time are necessary. One in particular that struck me as a little unusual, he's not allowed to smoke on conditional release? Condition 60? That's certainly possible. I don't, I'm not sure of all of the conditions, but you're right, there are a lot of restrictions imposed. And, you know, there's, I mean, part of the problem here, why we're arguing waiver is there hasn't been any sort of factual development about the reasons for these conditions or what exactly the respondents' objections are. And, you know, what he's agreeing to, and counsel for the state at the hearing here below said, you know, some of these concerns that respondent is bringing up for the first time, we might be able to accommodate. For example, if the issue is he's not sure what holidays he's allowed to go outside on, well, that seems like something that maybe DHS could provide him a list of the holidays, and then that concern would be satisfied. But now it's either left to the circuit court or to this court without any factual development at all to say, well, either we're just going to strike out the conditions altogether, or we're going to now try and rewrite the conditional release plan to say that this is going to be sufficient to protect the community and also facilitate respondents' treatment in the community. But if the state's counsel, if the state is proposing this particular plan, it seems to me that the state would have made some direct correlation between what you're seeking in the plan to what we're trying to protect the public from. It seems that every condition there should somehow be related or specifically related to this particular case. Well, I guess I agree to an extent, Your Honor. I do think that the plan, that the, you know, for many of these restrictions, I think it's likely that there's something that they apply to all potential SVPs. I mean, they're all similarly situated in at least some ways. And, you know, other parts of the plans besides just these restrictions, you know, set forth the treatment and various other matters, and those certainly can be tailored to this respondent. And, you know, again, there's not a lot of record for me to describe how, in this case, why these particular conditions, why the other pieces of this particular conditional release plan. But counsel for the state below did explain to the court that this plan had been developed with a respondent as part of his treatment, as part of planning for being out in the community. And he agreed to the plan at that time. And I certainly understand that, you know, that not arguing that that agreement is a waiver of all future ability to object to the plan. But in this particular situation, it was incumbent upon respondent to either say, you know, we need more time to try and work on the plan, or he's not going to agree to the plan at this time. And, you know, either bring the objections before the court and the court can try and, you know, send the plan back, perhaps send the plan back to DHS. But it should be DHS. The SEP Act provides that it's DHS that develops this plan and not the court. So I guess to the extent that this court is concerned that there's not enough tailoring or not enough support for the restrictions here, I think the appropriate remedy would be to send it back to the circuit court to do some additional fact finding. But respondent's not entitled to be put on conditional release until DHS develops this plan and the plan is put into place. It doesn't make sense to just strike out the conditions that respondent says, well, this one goes a little bit too far. I'm tying this up unless you have any burning points you need to make for anything else on the panel has additional questions. No, Your Honor. Thank you very much for this court affirmed. Mr. Barnes. Thank you, Your Honor. I suppose, just to start with, I want to focus on something my colleagues said multiple times, which is there hasn't been any factual development for some of these conditions as to how they relate to Mr. And I would say that that's a fair summary of what our problem is with some of these conditions, and the state's position seems to be that it's somehow, Mr. Holt's job to provide a basis to deprive himself of some of these rights, when certainly that has to fall on the state that the state should have to provide the reason why Mr Holt cannot look up a recipe for a souffle on YouTube, or whatever other activity he wants to engage in on the internet, or whether he wants to talk to a reporter about anything, or whether he wants to publish a cookbook or whatever he wants to publish. Certainly it should be the state's burden to say why he should not be allowed to do that. And Justice Mitchell, just to touch on your question. In my experience, in these cases, these plans are almost always identical. They very rarely have any sort of variation. And if they do, they're very minor. These are blanket restrictions that are imposed in virtually every case. They rarely change. And that simply feeds into this notion that these restrictions, while being incredibly pervasive and incredibly broad, are not tailored to Mr. Holt. They are just imposed as de facto restrictions, regardless of what Mr. Holt's history is like, regardless of what his offenses were like. And I do want to touch very briefly on this waiver issue, because the state's position that Mr. Holt cannot go out onto conditional release really suggests that what the state envisions is really no alternative. If Mr. Holt is required to object to the plan, and if those objections are overruled, he has to stay in the TDF indefinitely. One, that's simply not a practical, reasonable alternative, but it also means there wouldn't be a final judgment from which to appeal these conditions. That's the only way these conditions get before your honors is if he objects, the plan is entered, and it's worth knowing the plan is a court order. This is not a suggestion. This is not something that DHS only makes up and that's it. DHS might propose the conditions, but ultimately it's a court order with the force of law. So the alternative of him just saying, I will stay in the TDF forever because I don't want to agree to these gives no way to provide any sort of judicial review of these conditions. As to condition 33, and the state's concern that Mr. Holt might be able to use the internet for some sort of illicit purpose, and the immediacy of that availability, I think the state is really selling itself short on its monitoring capabilities here. Particularly when it comes to something as simple as browsing, you know, viewing browsing history. This is something that is not beyond the state to monitor on a daily basis or a twice daily basis or a bi-weekly basis or whatever you want to impose. And the problem, of course, is just how much content is swept up in this. Yes, the state certainly has an interest in prohibiting Mr. Holt from engaging in something that is criminal. But the sheer breadth of these conditions squashes an incredible amount of content and freedom and speech activity. It's difficult, I think, even for me, as a child of the internet, to really understand just how much stuff is on the internet. It is incomprehensible, and it's all swept up by this. And I hate to sound like a broken record, but it's all swept up by this, and it's not particularized to him. That is really, I think, the linchpin here, that these are things that DHS proposes in every case, and it's put in every conditional release plan, and it has nothing to do with Mr. Holt. And that should be the state's burden. I think at the end of the day, that is essential. That if the state wants to impose a crushing restriction on speech, it should be required to say why it's necessary, and without it, it should be unconstitutional. And I suppose just my last point I want to make is I believe my colleague said that Mr. Holt, this is referring to the vagueness conditions, he can ask for clarification when he's unsure. And no other law functions like that, Your Honors. No other piece of legislation or court order functions like that, where if we're unsure what the elements are for murder, we call VAG or DHS or IDOC and ask. I'm not sure about this. Can you give me some clarification? The law requires the plan be clear. And as it exists now, it is not. So unless Your Honors have any additional questions, I have nothing further. I would ask this court to reverse, first for a new trial, but in the alternative, reverse for modification of the conditional release plan. Any questions? Thank you both very much. Thank you to Mr. Barnes and your firm for continuing to do these cases on a regular basis. As Mr. Crinkle mentioned, I think your firm has the bulk of them, and they're hard cases, and both of you all did an excellent job, and thank you.